UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| James Friedlander,<br><br>    Plaintiff,<br><br>v.<br><br>Edwards Lifesciences, LLC, Edwards Lifesciences Corporation, and Matthew Borenzweig,<br><br>    Defendants. | Case No. 16-cv-1747 (SRN/KMM)<br><br><br>**MEMORANDUM OPINION AND ORDER** |

Clayton D. Halunen, Barbara J. Felt, Kaarin S. Nelson, and Stephen M. Premo, Halunen & Associates, 80 South Eighth Street, Suite 1650, Minneapolis, Minnesota 55402, for Plaintiff.

David P. Pearson and Reid Golden, Winthrop & Weinstine, PA, 225 South Sixth Street, Suite 3500, Minneapolis, Minnesota 55402, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

Plaintiff James Friedlander brought this suit against Defendants Edwards Lifesciencs, LLC ("Edwards LLC"), Edwards Lifesciences Corp. ("Edwards Corp."),[1] and Matthew Borenzweig, alleging claims for violation of the Minnesota Whistleblower Act ("MWA" or, the "Act") by Edwards LLC and Edwards Corp., and tortious interference with contractual relations by Borenzweig. Defendants now move for judgment on the pleadings as to both counts. (*See* Doc. No. 16.) Of particular relevance

---

[1] Where necessary, and to avoid confusion, Edwards LLC and Edwards Corp. will be referred to collectively as "Edwards."

here, Defendants argue that Friedlander's MWA claim fails as a matter of law because Friedlander "blew the whistle" on conduct Defendants were already aware of. According to Defendants, Minnesota law requires whistleblowers to act with the purpose of "exposing an illegality"—a requirement that cannot be met where the employer already knows of the allegedly illegal conduct. In contrast, Friedlander contends that while the expose-an-illegality rule *was* the law, it has been abrogated by recent amendments to the MWA. By his reading of the Act, a report made for purposes of "blowing the whistle" constitutes statutorily protected conduct so long as it is not knowingly false or made in reckless disregard of the truth.

Resolution of these competing interpretations of the MWA will likely prove determinative of Defendants' motion as to Friedlander's whistleblower claim. Because no controlling appellate decision, constitutional provision, or statute of the state of Minnesota exists to guide the Court in making a determination, the Court concludes—after careful consideration—that the interests of justice would be best served by certifying the issue to the Minnesota Supreme Court. Accordingly, the Court will stay proceedings in this case pending a response to the certified question presented below.

**II.    CERTIFICATION PROCEDURE**

Pursuant to the Uniform Certification of Questions of Law Act (1997), Minn. Stat. § 480.065, the Minnesota Supreme Court may answer a question of law certified to it by a federal court "if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of [the state of Minnesota]" that would resolve the issue. Minn. Stat. § 480.065,

subd. 3.  The Eighth Circuit has indicated that the power to certify a question should be utilized sparingly, such as when there is a particularly close question of state law lacking controlling judicial or legislative guidance.  *See Shakopee Mdewakanton Sioux Cmty. v. City of Prior Lake*, 771 F.2d 1153, 1157 n.2 (8th Cir. 1985).  It is clear, however, that the decision ultimately "rests in the sound discretion" of the district court.  *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974).

Several procedural requirements are mandated by Minnesota law in order to effectuate certification.  Most pertinently, the certifying court must issue an order containing:

> (1) the question of law to be answered;
> (2) the facts relevant to the question, showing fully the nature of the controversy out of which the question arose;
> (3) a statement acknowledging that the Supreme Court of [Minnesota], acting as the receiving court, may reformulate the question; and
> (4) the names and addresses of counsel of record and parties appearing without counsel.

Minn. Stat. § 480.065, subd. 6.  The Minnesota Supreme Court may also require delivery of all or part of the underlying record.  *Id.* at subd. 5.

## III.   RELEVANT FACTS

In light of the procedural posture, the facts relevant to resolution of this matter are uncontested and may be briefly stated.  *See Iowa Beef Processors, Inc. v. Amalgamated Meat Cutters and Butcher Workmen of N. Am.*, 627 F.2d 853, 855 (8th Cir. 1980). Plaintiff James Friedlander is a Minnesota citizen, who, from August 15, 2011 until his

discharge on July 17, 2015, worked for Edwards[2] as its Director of Corporate Accounts in the company's Heart Valve Therapy division. (Notice of Removal [Doc. No. 1], Ex. A ("Compl."), ¶¶ 1, 7, 34.) In this role, Friedlander was tasked with providing executive support to Edwards' sales representatives "by facilitating the negotiation and procurement of contracts." (*Id.* at ¶ 7.) Although Edwards is a California corporation with its principal place of business in California, at all relevant times Friedlander worked remotely from his home in Minnesota. (*Id.* at ¶ 8.) According to the Complaint, Friedlander was a "high performer" who "regularly met or exceeded Edwards' expectations of him." (*Id.* at ¶ 9.)

Of particular relevance to this dispute, in August 2014, Edwards entered into a contract with Novation, a national group purchasing organization for health care facilities. (*Id.* at ¶ 10.) Under the terms of Edwards' contract with Novation, health care facilities that met certain growth metrics were entitled to price concessions or rebates. (*Id.* at ¶ 11.) This duty was triggered once the facility met the growth metric, and the facility itself was not required to take any additional action before receiving its price concession. (*Id.* at ¶ 12.)

In January 2015, several senior Edwards sales executives, including Vice President of Sales Matt Borenzweig and Friedlander, held a pricing call conference,

---

[2] The Court acknowledges that the parties dispute whether Friedlander has properly alleged that he was employed by both Edwards Corp. and Edwards LLC, or just Edwards LLC. (*See, e.g.*, Defs.' Mem. in Supp. of Mot. for J. on the Pleadings [Doc. No. 18] ("Defs.' Mem. in Supp.") at 7; Pl.'s Mem. in Opp. to Defs.' Mot. for J. on the Pleadings [Doc. No. 36] ("Pl.'s Mem. in Opp.") at 29.) However, that issue is not relevant to resolution of the certified question, and for convenience the Court will assume here that Friedlander was properly employed by both entities.

during which the Novation contract was a topic of discussion. (*Id.* at ¶ 13.) Given that several Novation facilities had met, or were on track to meet, the growth metrics that would entitle them to price concessions, a question arose as to how to handle these impending concessions. (*Id.* at ¶ 14.) Borenzweig stated that he did not want to give price concessions to facilities unless they specifically asked for them. (*Id.* at ¶ 15.) This statement was apparently met with a "growing consensus" in favor by the group attending the call—Friedlander, however, spoke up to oppose the dishonest plan, stating that Edwards was obligated to issue price concessions to *all* facilities that earned them, and not just those that requested them. (*Id.* at ¶¶ 15-16.) This "refusal to toe the company line" apparently "infuriated" Borenzweig, who "hated when employees 'went rogue,'" and who ultimately insisted that Edwards would only issue price concessions to those facilities that asked for them. (*Id.* at ¶¶ 17-18.)

Two months later, in March 2015, Edwards held another pricing call conference at which the Novation contract was again a subject of discussion. (*Id.* at ¶ 19.) Friedlander once more opposed the plan to wrongfully withhold price concessions, saying doing so "made him feel dirty."[3] (*Id.* at ¶ 20.) In response, at least one other employee on the call voiced his support for not honoring the terms of the contract, and this stance was once again approved by Borenzweig. (*Id.* at ¶ 21.) At some point after this call, Borenzweig apparently asked Friedlander's direct supervisor, John Tanner, to fire Friedlander, but

---

[3] Importantly, Friedlander does not allege that he made his concerns known to anyone who was not already aware of the plan to withhold price concessions, either at this time or at any other time.

5

Tanner refused as there were no legitimate grounds to do so.[4] (*Id.* at ¶ 25.)

Sometime in late April 2015, Friedlander was on a business trip when he ran into a number of colleagues, including Tanner, who invited him to join them for lunch. (*Id.* at ¶ 26.) Friedlander obliged. When the check came, Tanner told Friedlander that he had forgotten his wallet, and ordered Friedlander to cover the bill. Friedlander obeyed the command and paid the amount due, using his corporate account to do so. (*Id.* at ¶¶ 27, 29.)

In June 2015, Friedlander was questioned by Edwards human resources personnel regarding the lunch expense, apparently because the amount exceeded the individual limit allowed under company policy. (*Id.* at ¶ 29.) Friedlander explained that he had been ordered to pay by his superior, and offered to pay the expense directly and have it taken off of his expense report. (*Id.* at ¶¶ 30, 33.) This request was refused and he was instructed—"oddly"—to not withdraw the expense request. (*Id.*) The following month, on July 17, 2015, Friedlander was fired by Edwards. When Friedlander inquired about the "truthful reason" for his discharge, Edwards replied:

> Your employment was terminated based on the Company's good faith conclusion that you engaged in serious misconduct, and specifically that you failed to comply with the Company's policies relating to expenses and expense reporting, and that your actions in connection with the expenses and expense reporting issues reflected a lack of honesty and integrity and demonstrated poor judgment.

(*Id.* at ¶ 35.)

---

[4] Tanner himself was apparently fired by Borenzweig in April 2015, shortly after he too expressed opposition to Edwards' plan to disregard its contractual obligations under the Novation contract. (Compl. ¶ 28.)

According to Friedlander, Edwards' reason for his termination is mere pretext, and the real reason was his decision to report "actual, planned, and suspected violations of law" to his superiors, including breach of contract, breach of the duty of good faith and fair dealing, breach of fiduciary duty, and violations of California's Unfair Competition Law.  (*Id.* at ¶¶ 36-39.)

IV.   **ARGUMENTS OF THE PARTIES**

At issue in this matter is whether Friedlander's decision to report suspected violations of law to superiors who were already fully aware of (and, indeed, complicit in) those violations constitutes conduct protected under the MWA.  In relevant part, that Act provides that "[a]n employer shall not discharge . . . an employee . . . because: (1) the employee . . . in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law to an employer . . . ."  Minn. Stat. § 181.932, subd. 1.  In particular, the parties dispute whether the requirement that the employee's report be made in "good faith" means that it must have been made with the purpose to "expose an illegality."

Defendants note that since the 2000 case of *Obst v. Microtron, Inc.*, 614 N.W.2d 196 (Minn. 2000), Minnesota appellate courts have apparently uniformly answered that question in the affirmative.  *See* 614 N.W.2d at 202 ("In order to determine whether a report of a violation or suspected violation of law is made in good faith, we must look not only at the content of the report, but also at the reporter's purpose in making the report.  The central question is whether the reports were made for the purpose of blowing the whistle, i.e., *to expose an illegality*.") (emphasis added).  According to the Minnesota

7

Supreme Court, the rationale for this requirement is "to ensure that the report that is claimed to constitute whistle-blowing was in fact a report made for the purpose of exposing an illegality and not a vehicle, identified after the fact, to support a belated whistle-blowing claim." *Id.*

Although the supreme court does not appear to have had cause to address the matter, this Court, the Minnesota Court of Appeals, and the Eighth Circuit have all at various time concluded that the expose-an-illegality rule enunciated in *Obst* means that "the mere mention of a suspected violation that the employer already knows about does not constitute a 'report' under the [MWA]." *Erickson v. City of Orr*, No. A05-481, 2005 WL 2277395, at *7 (Minn. Ct. App. Sept. 20, 2005); *see also Hitchcock v. FedEx Ground Package Sys.*, 442 F.3d 1104, 1106 (8th Cir. 2006); *Pederson v. Bio-Med Applications of Minn.*, 992 F. Supp. 2d 934, 939 (D. Minn. 2014). Given that Friedlander does not allege that he reported the plan to violate the Novation contract to anyone who was not already aware of that plan, Defendants argue that his conduct was not protected by the MWA. (*See* Defs.' Mem. in Supp. at 10-11.)

Friedlander counters that while Defendants' interpretation of the "good faith" requirement was, at one point, accurate, it has been superseded by legislative amendments to the MWA made in 2013. *See* 2013 Minn. Laws ch. 83, § 4. Among other changes, those amendments provided a statutory definition of the term "good faith" for the first time, indicating that it meant "conduct that does not violate section 181.932, subdivision 3." Minn. Stat § 181.931, subd. 4. That section in turn bars employees from making statements or disclosures "knowing that they are false or that they are in reckless

disregard of the truth." *Id.* at § 181.932, subd. 3. Taken together, Friedlander argues that the effect of this amendment was to legislatively overrule the judicially constructed expose-an-illegality requirement found in *Obst* and its progeny, in favor of a broad definition of "good faith" that does not require any evaluation of the motives underlying the employee's actions. (*See* Pl.'s Mem. in Opp. at 12-13.) By his reading, because the report of unlawful activity relating to the Novation contract was neither knowingly false nor made in reckless disregard for its truth, it was protected under the MWA regardless of whether his superiors were already aware of the underlying activity. (*See id.* at 17.)

This Court is not aware of any controlling precedent that decides the question of whether the 2013 amendments to the MWA eliminated the expose-an-illegality requirement as an independent consideration in analyzing a whistleblower claim. It is true that several decisions of this Court, as well as of the Minnesota Court of Appeals, have continued to apply the rule in post-2013 cases, but a review of the decisions and briefing in those cases leaves this Court unconvinced that the effect of the 2013 amendments was fully argued and considered. *See, e.g.*, *Becker v. Jostens, Inc.*, No. 14-cv-5104 (JRT/BRT), 2016 WL 5402189 (D. Minn. Sept. 26, 2016); *Jung v. City of Minneapolis*, No. 14-cv-3141 (DWF/LIB), 2016 WL 2733113 (D. Minn. May 10, 2016); *Watt v. City of Crystal*, No. 14-cv-3167 (JNE/JJK), 2015 WL 7760166 (D. Minn. Dec. 2, 2015); *Weber v. Minnesota Sch. of Bus., Inc.*, No. A14-0831, 2014 WL 7011353 (Minn. Ct. App. Dec. 15, 2014). Contrary to these cases, in a Hennepin County district court case that does discuss the impact of the 2013 amendments, Judge Kathleen Sheehy concluded that those amendments did in fact abrogate the expose-an-illegality

requirement.  *See Surescripts, LLC v. Theisen-Axelrod*, No. 27-cv-14-15850, 2015 WL 11252208 (Minn. Dist. Ct. Jan. 6, 2015).  Neither the text of the amending act nor the legislative history behind it clearly indicates whether the Minnesota state legislature intended the 2013 amendments to supersede or merely complement the judicially imposed expose-an-illegality rule.  In light of this lack of controlling guidance, and the frequency with which this issue appears before this and other courts, the Court believes that the Minnesota Supreme Court should have the opportunity—if it so chooses—to clearly decide the issue.  *See Savig v. First Nat'l Bank of Omaha*, No. 09-cv-132 (JNE/RLE), 2009 WL 1955476, at *8 (D. Minn. July 6, 2009).

## V.   CERTIFIED QUESTION OF LAW

Pursuant to Minn. Stat. § 480.065, the Court accordingly certifies the following question of law to the Minnesota Supreme Court for resolution:

> *Did the 2013 amendment to the Minnesota Whistleblower Act defining the term "good faith" to mean "conduct that does not violate section 181.932, subdivision 3" eliminate the judicially created requirement that the putative whistleblower act with the purpose of "exposing an illegality?"*

The Court acknowledges that the Minnesota Supreme Court may, if it so chooses, reformulate the question.  *See* Minn. Stat. § 480.065, subd. 6(3).

## VI.  ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The case is **STAYED** pending resolution of the certified question;

2. The Court will defer consideration of Defendants' Motion for Judgment on the Pleadings [Doc. No. 16] until such time as a response is received from

        the Minnesota Supreme Court;

3.     The following question is certified to the Minnesota Supreme Court: Did the 2013 amendment to the Minnesota Whistleblower Act defining the term "good faith" to mean "conduct that does not violate section 181.932, subdivision 3" eliminate the judicially created requirement that the putative whistleblower act with the purpose of "exposing an illegality?";

4.     The names and addresses of the parties' counsel appear in Appendix A;

5.     The Clerk of Court is directed to forward a copy of this Order to the Minnesota Supreme Court; and

6.     The Clerk of Court is directed to furnish to the Minnesota Supreme Court such part of the record of this case as that court may request.


Dated: November 29, 2016                            s/Susan Richard Nelson
                                                                   SUSAN RICHARD NELSON
                                                                   United States District Judge

# APPENDIX A

1. The names and address of counsel for Plaintiff are:

    Clayton D. Halunen, Barbara J. Felt, Kaarin S. Nelson, and Stephen M. Premo

    Halunen & Associates

    80 South Eighth Street, Suite 1650

    Minneapolis, Minnesota 55402

2. The names and address of counsel for Defendants are:

    David P. Pearson and Reid Golden

    Winthrop & Weinstine, PA

    225 South Sixth Street, Suite 3500

    Minneapolis, Minnesota 55402